UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 OCT 27 PM 2: 35

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| MOHAMMED JIHAD BAHRM RASHID, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, in his official | ) |
| capacity as President of the United States; | ) |
| PATRICIA HYDE, in her official capacity | ) |
| as Acting Boston Field Office Director, | ) |
| Immigration and Customs Enforcement, | ) |
| Enforcement and Removal Operations; | ) |
| VERMONT SUB-OFFICE DIRECTOR OF | ) |
| IMMIGRATION AND CUSTOMS | ) |
| ENFORCEMENT, ENFORCEMENT AND | ) |
| REMOVAL OPERATIONS; TODD M. | ) |
| LYONS, in his official capacity as Acting | ) |
| Director, U.S. Immigration and Customs | ) |
| Enforcement; PETE R. FLORES, in his | ) |
| official capacity as Acting Commissioner | ) |
| for U.S. Customs and Border Protections; | ) |
| KRISTI NOEM, in her official capacity as | ) |
| Secretary of the United States Department | ) |
| of Homeland Security; MARCO RUBIO, in | ) |
| his official capacity as Secretary of State; | ) |
| PAMELA BONDI, in her official capacity | ) |
| as U.S. Attorney General; and GREG | ) |
| HALE, in his official capacity as | ) |
| Superintendent, Northwest State | ) |
| Correctional Facility - Saint Albans, | ) |
| | ) |
| Respondents. | ) |

Case No. 2:25-cv-732

**OPINION AND ORDER ON MOTION FOR LEAVE TO AMEND PETITION AND FILE
SUPPLEMENTAL BRIEFING AND ON PETITION FOR HABEAS CORPUS
(Docs. 1, 10)**

Petitioner Mohammed Jihad Bahrm Rashid brings this Petition for a Writ of Habeas

Corpus under 28 U.S.C. § 2241, seeking his release from immigration detention. (Doc. 1.)

Respondents ("the Government") are various government officials whom Mr. Rashid identifies

as his legal custodians.  Mr. Rashid has been detained since his arrival in the United States on or about July 27, 2024, including after his grant of asylum on December 3, 2024.  (Doc. 5-1 ¶¶ 6, 11.)  The court heard oral argument on the Petition on September 5, 2025, and the parties have now completed their briefing.  Petitioner subsequently filed a Motion for Leave to Amend the Petition for a Writ of Habeas Corpus and Motion for Supplemental Briefing (Doc. 10), which the Government opposes (Doc. 11).

For the following reasons, the court DENIES the Motion for Leave to Amend the Petition for Writ of Habeas Corpus and Motion for Supplemental Briefing.  (Doc. 10).  The court GRANTS IN PART the Petition for a Writ of Habeas Corpus.  (Doc. 1).

## **Background**

Mr. Rashid was born and raised in Gaza.  (Doc. 5 ¶ 6.)  He is 29 years old.  (Doc. 1 ¶ 22.) In 2024, Mr. Rashid fled Gaza and came to the United States as a stowaway on a ship traveling from Germany to Rhode Island.  (Doc. 5-1 ¶ 6.)  Upon the ship's arrival on July 27, 2024, Immigration and Citizenship Enforcement ("ICE") agents detained Mr. Rashid and transferred him to a detention facility in Rhode Island.  (*Id.*)  On August 8, 2024, ICE issued Mr. Rashid a Form I-863, Notice to Referral to Immigration Judge, alleging that he arrived in the United States as a stowaway.

Although stowaways have few rights under this country's immigration laws, they do have a right to assert a fear of persecution in their home country.  8 U.S.C. § 1225(a)(2).  If the stowaway is found to have a credible fear of persecution, they may submit an application for asylum.  *Id.*  In this case, Mr. Rashid was found to have a credible fear of persecution, and he submitted an application for asylum, withholding of removal, and relief under the Convention

Against Torture on October 9, 2024. (Doc. 5-1 ¶ 9.) The immigration judge granted his asylum application on December 3, 2024. (*Id.* ¶ 11.)

On January 3, 2025, ICE appealed the immigration judge's decision to the Board of Immigration Appeals ("BIA"). (*Id.* ¶ 12.) The parties completed their initial briefing in spring 2025, but the BIA requested additional briefing from both parties. (*Id.* ¶¶ 14–15.) They submitted this additional briefing on July 1, 2025. (*Id.* ¶ 16.)

During the pendency of his proceedings, Mr. Rashid has remained detained. He has been transferred four times. On November 24, 2025, ICE transferred Mr. Rashid from Rhode Island to a detention facility in Plymouth, Massachusetts. (*Id.* ¶ 10.) On March 5, 2025, ICE transferred him to Berlin, New Hampshire. (*Id.* ¶ 13.) On August 20, 2025, ICE transferred Mr. Rashid to Burlington, Massachusetts. (*Id.* ¶ 17.) Finally, on August 21, 2025, ICE transferred Mr. Rashid to Swanton, Vermont, where he remains detained. (*Id.* ¶¶ 18, 22.) On September 2, 2025, Mr. Rashid filed this Petition for Habeas Corpus.

### Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA") provides for the detention of certain noncitizens during the pendency of their immigration proceedings. For noncitizens who do not have an order of removal, detention is governed by 8 U.S.C. § 1225(b), § 1226(a), or § 1226(c). Generally, § 1225(b) applies to "arriving" noncitizens or "applicants for admission" who are "seeking admission." *See* 8 U.S.C. § 1225(b)(1)(A)(i), (b)(2)(A). Section 1226(c) governs the detention of noncitizens apprehended within the United States on criminal grounds. Section 1226(a) is a catchall provision that governs the detention of any other noncitizen apprehended by immigration enforcement and is generally understood to apply to noncitizens "already present in the United States," i.e., no longer at the border. *Jennings v. Rodriguez*, 583 U.S. 281, 303

(2018). Section 1226(a) creates a statutory right to a bond hearing before an immigration judge, but § 1225(b) and § 1226(c) call for mandatory detention. *Id.* at 302, 305–06.

Recently, in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), the BIA held that all noncitizens who enter the United States without inspection are "applicants for admission" who are "seeking admission" within the meaning of § 1225(b), no matter how long they have lived in the United States. This decision has upended the historical delineation between detention under § 1225(b) and § 1226(a); the former was understood to be for noncitizens apprehended at or near the border, while the latter was understood to be for noncitizens apprehended within the interior of the United States, no matter their manner of entry. The validity of *Yajure Hurtado*'s reasoning is being litigated in federal courts around the country. *See Lopez Benitez v. Francis*, --- F. Supp. 3d ----, 2025 WL 2371588 (S.D.N.Y. 2025); *Samb v. Joyce*, No. 25 Civ. 6373, 2025 WL 2398831 (S.D.N.Y. Aug. 19, 2025) (slip opinion); *Doe v. Moniz*, --- F. Supp. 3d ----, 2025 WL 2576819 (D. Mass. 2025); *Leal-Hernandez v. Noem*, No. 25-cv-02428, 2025 WL 2430025 (D. MD. Aug. 24, 2025); *Kostak v. Trump*, Civil Action No. 25-1093, 2025 WL 2472136 (W.D. La. Aug. 27, 2025).

## Analysis

Mr. Rashid's petition alleges that his detention violates 8 U.S.C. § 1226(a)'s warrant requirement, the Fifth Amendment's Due Process Clause, and the Fourth Amendment. The Proposed Amended Petition seeks to add an Eighth Amendment claim and discussion of *Yajure Hurtado*. Mr. Rashid also seeks additional briefing to address *Yajure Hurtado* and an immigration judge's September 25, 2025 decision that she did not have jurisdiction to consider Mr. Rashid's request for bond. (Doc. 10). The Government advances several arguments as to why the court should deny Mr. Rashid's petition and his motion to amend the petition and file

supplemental briefing. (*See* Doc. 11.) The court begins by addressing Mr. Rashid's request to amend his petition and file supplemental briefing.

## I.    Motion for Leave to Amend Petition and to File Supplemental Briefing

On September 25, 2025, an immigration judge denied Mr. Rashid's request for bond, concluding that she did not have jurisdiction to consider the request under *Yajure Hurtado*. (Doc. 10-1 ¶ 30.) On October 1, 2025, Mr. Rashid filed a motion requesting leave to file an amended habeas petition and to submit supplemental briefing on *Yajure Hurtado*. In addition to adding a few factual allegations, the Proposed Amended Petition adds a claim under the Eighth Amendment for unreasonable bond and cruel and unusual punishment. (*See* Doc. 10-1.)

Fed. R. Civ. P. 15 provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "a district court may properly deny leave when amendment would be futile." *Stegemann v. United States*, 132 F.4th 206, 210 (2d Cir. 2025) (internal quotation marks and citation omitted). An amendment is futile "when a proposed amended complaint could not withstand a motion to dismiss." *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (internal quotation marks and citation omitted).

The court agrees with the Government that amending the Petition to include an Eighth Amendment claim would be futile. The Second Circuit has held that, because "the Eighth Amendment is concerned with punishment of prisoners, which a state cannot mete out until after it has secured a formal adjudication of guilt in accordance with due process of law, the relevant constitutional provision governing a state's responsibility to care for persons in its custody who are not prisoners, such as civil detainees or pretrial detainees, is not the Eighth Amendment but is, instead, the Due Process Clause of the Fourteenth Amendment." *Lara-Grimaldi v. County of Putnam*, 132 F.4th 614, 631 (2d Cir. 2025) (cleaned up). Because Mr. Rashid is a civil detainee,

the Eighth Amendment does not apply to him, and adding an Eighth Amendment claim would be futile. To the extent that the Proposed Amended Petition asserts new factual allegations regarding Mr. Rashid's bond hearing, those facts do not alter the court's analysis in this case.

As for the supplemental briefing that Mr. Rashid has requested, the court has concluded that the BIA's decision in *Yajure Hurtado*, 29 I&N Dec. 216, does not bear on this case. *Yajure Hurtado* concerned whether every noncitizen who enters the country without inspection or parole is subject to mandatory detention under 8 U.S.C. § 1225(b) regardless of whether they effected an entry into the country or how long they have been living here. As discussed in greater detail below, Mr. Rashid never effected an entry into the United States and came to this country as a stowaway, a special class of arriving noncitizens under the INA. That puts him in a very different position than the noncitizens affected by *Yajure Hurtado*'s holding. To the extent that Mr. Rashid can advance an argument that he is subject to discretionary detention under 8 U.S.C. § 1226(a) rather than mandatory detention under § 1225(b), that argument does not implicate *Yajure Hurtado*.

The court DENIES Mr. Rashid's Motion to File an Amended Petition (Doc. 10).

## II.    Petition for Writ of Habeas Corpus

### A.    Jurisdiction

Before turning to the merits of Mr. Rashid's petition, the court addresses two jurisdictional arguments raised by the Government.

First, the Government argues that, "to the extent [Mr. Rashid] is challenging the process by which his asylum claim is adjudicated, this Court lacks subject-matter jurisdiction to consider those arguments" because of the jurisdiction-stripping provision found at 8 U.S.C. § 1252(a)(2)(A). (Doc. 5 at 9.) The court does not interpret Mr. Rashid's habeas petition as a

challenge to his asylum proceedings. He does not challenge his credible fear interview, the proceedings before the immigration court, or the pace at which the BIA is adjudicating his appeal. He is not challenging the "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)." 8 U.S.C. § 1252(a)(2)(A)(iv). Rather, Mr. Rashid challenges his prolonged detention during those proceedings as a constitutional matter. Courts have routinely entertained such challenges. *See Ramos Funes v. Searls*, No. 19-CV-6332, 2020 WL 1956346 (W.D.N.Y. Apr. 23, 2020) (entertaining challenge to prolonged detention under § 1225(b)); *Bermudez Paiz v. Decker*, No. 18-CV-4759, 2018 WL 6928794, at *6 (S.D.N.Y. Dec. 27, 2018) (same); *Lett v. Decker*, 346 F. Supp. 3d 379, 386 (S.D.N.Y. 2018) (same); *Birch v. Decker*, No. 17-cv-6769, 2018 WL 794618 (S.D.N.Y. Feb. 7, 2018) (same).

The Government also invokes 8 U.S.C. § 1252(a)(2)(B)(ii) to the extent that Mr. Rashid is challenging a denial of parole. (Doc. 5 at 9–10.) As the briefing makes clear, Mr. Rashid is not challenging a denial of parole, so § 1252(a)(2)(B)(ii) does not affect the court's jurisdiction in this case.

### B.    Mr. Rashid's Statutory and Regulatory Rights

The parties dispute the statutory basis for Mr. Rashid's detention and whether he has a statutory or regulatory right to a bond hearing. The Government contends that Mr. Rashid is subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B), which, in the Government's view, "requires detention of any asylum applicant until the asylum process is complete." (Doc. 5 at 2.) Mr. Rashid responds that he is detained under the discretionary detention provision set forth at 8 U.S.C. § 1226(a) and is therefore entitled to a bond hearing. The parties have not cited, and the court has not found, any case law that directly addresses this issue. Mr. Rashid also

argues that, if he *is* detained under § 1226(a), the Government improperly detained him without the warrant that § 1226(a) requires.

**1.    Mr. Rashid is Detained Under 8 U.S.C. § 1225(b)(1)(B)(ii)**

Section 1225 concerns the inspection of "applicants for admission" and other noncitizens. The provisions of § 1225 further explain the removal proceedings afforded to such noncitizens if they are found to be inadmissible, including the consideration of any claim that the noncitizen fears persecution in their home country. The statute outlines two general procedures for two different classes of noncitizens, as explained by the Supreme Court in *Jennings*:

> [A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See § 1225(b)(1)(A)(i) (citing §§ 1182(a)(6)(C), (a)(7)). Section 1225(b)(1) also applies to certain other [noncitizens] designated by the Attorney General in his discretion. See § 1225(b)(1)(A)(iii). Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here). See §§ 1225(b)(2)(A), (B).

583 U.S. at 287.

Section 1225(b)(1) does not mention stowaways. The Government maintains that its mandatory detention provisions nevertheless apply to stowaways like Mr. Rashid. That is because § 1225(a)(2), which governs the inspection of stowaways, specifies that "[a] stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B)." In turn, § 1225(b)(1)(B)(ii) specifies that, if a noncitizen is found to have a credible fear of persecution, "the [noncitizen] shall be detained for further consideration of the application for asylum." In sum, the Government argues that, because stowaways must undergo a credible fear interview under § 1225(b)(1)(B) before applying for asylum, they are also subject to the mandatory detention provisions contained within § 1225(b)(1).

8

Mr. Rashid argues that, just because the paragraph concerning stowaways borrows § 1225(b)(1)'s credible fear interview process does not mean that the § 1225(b)(1) otherwise applies to him. His argument is persuasive. First, § 1225(b) is entitled "Inspection of applicants for admission," *see Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (cleaned up)), yet stowaways like Mr. Rashid cannot be considered "applicants for admission." *See* 8 U.S.C. § 1225(a)(2). They cannot, therefore, be placed in the expedited removal proceedings described in § 1225(b)(1).

Moreover, from a textual perspective, § 1225(b)(2) is entitled "Inspection of other aliens," and addresses the inspection of applicants for admission who do not fall within § 1225(b)(1). Section 1225(b)(2)(A) specifies that, "in the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229(a) of this title." Section 1225(b)(2)(B) then lists exceptions to Subparagraph (A):

Subparagraph (A) shall not apply to a[] [noncitizen]—

(i) who is a crewman,

(ii) to whom paragraph [(b)](1) applies, or

(iii) who is a stowaway.

8 U.S.C. § 1225(b)(2)(B). If paragraph (b)(1) applied more generally to stowaways, it would be superfluous to separately list stowaways as a class of noncitizen to whom subparagraph (A) does not apply. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

Nevertheless, there are a few problems with Mr. Rashid's view of § 1225(b)(1). First, just because Mr. Rashid is not subject to the broader expedited removal process under § 1225(b)(1) does not mean he is not subject to the narrower set of provisions concerning credible fear interviews at § 1225(b)(1)(B), including the detention provisions tied to the credible fear process. If *only* the interview procedures applied to stowaways, there would be significant gaps in the statutory framework. For instance, § 1225(a)(2) specifies that stowaways who express fear of persecution should be referred for credible fear interviews, but it does not specify what should happen if a stowaway passes or fails the credible fear interview. Only by looking to § 1225(b)(1)(B)(iii) can one learn that an immigration officer will order the removal of anyone who fails their credible fear interview. Likewise, only by looking to § 1225(b)(1)(B)(ii) can one learn that, if an applicant passes the credible fear interview, they should receive further review of their asylum application—and remain in detention in the meantime.

The regulations implementing these statutes support the conclusion that Mr. Rashid is detained under § 1225(b)(1)(B)(ii). Under 8 C.F.R. § 208.5, a stowaway who expresses a fear of persecution "may be detained by the Service or otherwise paroled in accordance with [8 C.F.R.] § 212.5." 8 C.F.R. § 208.5(b)(2). According to the regulations, before the credible fear interview takes place, "[t]he stowaway shall be detained" and may only be paroled in case of a medical emergency or for a legitimate law enforcement objective. *Id.* § 241.11(d)(1). "A stowaway who has established a credible fear of persecution or torture . . . may be detained or paroled . . . during any consideration of the asylum application." *Id.* While these regulations contemplate the possibility of release via parole, parole is not the same as a bond hearing. One

key difference is that parole is discretionary and not subject to judicial review. *See Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016) (holding that 8 U.S.C. 1252(a)(5)(A) bars review of a decision to deny parole). The regulations governing the detention of stowaways therefore interpret such detention as mandatory, subject only to the broad discretionary power of parole.

Because Mr. Rashid does not have an order of removal, the only other possible authority for his detention is 8 U.S.C. § 1226(a).[1] That section, entitled "Apprehension and detention of aliens," provides that, "[o]n a warrant issued by the Attorney General, a[] [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." *Id.* § 1226(a). As the Supreme Court has explained, "§ 1226 applies to [noncitizens] already present in the United States," that is, noncitizens who have effected entry into the country and can, therefore, be "apprehended" and "arrested." *Jennings*, 583 U.S. at 303. Mr. Rashid was detained before entering the United States, so, according to the Supreme Court's reading of the statute, § 1226 does not apply to him.

Finally, § 1226(a) is undeniably a friendlier detention statute for noncitizens than § 1225(b)(1), yet the case law consistently notes the particularly "disfavored" status of stowaways in U.S. immigration law. *See Pineda Suero v. U.S. Dep't of Homeland Sec.*, No. 18 Civ. 4992, 2019 WL 1557130, at *3 (S.D.N.Y. Apr. 10, 2019) ("These prohibitions reflect Congress's judgment that 'stowaways are generally viewed as a disfavored category' of [noncitizens]." (quoting *Dia Nav. Co. v. Pomeroy*, 34 F.3d 1225, 1259 (3d Cir. 1994)); *see also Argenbright Sec. v. Ceskoslovenske Aeroline*, 849 F. Supp. 276, 281 (S.D.N.Y. 1994) (noting

---

[1] Section 1231(d) provides for the detention of stowaways pending removal, including prior to inspection. It does not discuss detention of stowaways who receive a credible fear interview.

11

that "stowaways are considered to be a 'disfavored' category of [noncitizens]"); *Linea Area Nacional de Chile S.A. v. Sale*, 865 F. Supp. 971, 980 (E.D.N.Y. 1994) (same). It does not follow that Congress would strip stowaways of the right to any sort of removal proceedings and bar them from being considered applicants for admission yet give them the benefit of more lenient detention provisions traditionally understood to apply only to noncitizens who have entered the country.

### 2. Detention Under 8 U.S.C. § 1225(b)(1)(B)(ii) is Mandatory Until the End of the Asylum Process

Mr. Rashid maintains that, even if he was originally subject to detention under § 1225(b)(1)(B)(ii), that statute does not mandate detention throughout the duration of the asylum proceedings. The Government takes the opposite position.

Section 1225(b)(1)(B)(ii) provides that, if a noncitizen demonstrates a credible fear of persecution, the noncitizen "shall be detained for further consideration of the application for asylum." In *Jennings*, the Supreme Court considered the meaning of the word "for" in the phrase "for further consideration." The respondents in that case argued that "for" meant that "detention authority ends once subsequent proceedings begin." *Jennings*, 583 U.S. at 301. Under that view, once asylum proceedings begin, the Government's sole detention authority is under § 1226(a).

Justice Alito, writing for a majority of the Court, rejected that position. The Court held that "§§ 1225(b)(1) and (b)(2) mandate detention of [noncitizens] throughout the completion of applicable proceedings and not just until the moment those proceedings begin." *Id.* at 302. In this case, Mr. Rashid's asylum proceedings before the immigration court have concluded, but the Government's appeal to the BIA remains pending. Other courts that have considered *Jennings* in this context have concluded that detention remains mandatory throughout the appeal process.

*See Bermudez Paiz*, 2018 WL 6928794, at *6 (petitioner was subject to mandatory detention under § 1225(b) even though his asylum claim was on appeal to the BIA); *Leke v. Hott*, 521 F. Supp. 3d 597, 600 (E.D. Va. 2021) (discussing the Supreme Court's holding in *Jennings* regarding mandatory detention for consideration of the asylum application and concluding that "there can be no dispute that Petitioner is an arriving [noncitizen] and that Petitioner's removal proceedings have not yet concluded in light of (i) the Fourth Circuit's pending review of Petitioner's asylum claim and (ii) the Fourth Circuit's Order staying the Immigration Judge's removal order"); *Djelassi v. ICE Field Office Dir.*, 434 F. Supp. 3d 917, 928–29 (W.D. Wash. 2020) (concluding that, under *Jennings*, § 1225(b) governs detention of arriving noncitizens until "both administrative and judicial proceedings are finalized").

In light of the foregoing, Mr. Rashid is subject to mandatory detention and therefore has no statutory right to a bond hearing.  Nor can he succeed in his argument that the Government violated § 1226(a) by arresting him without a warrant because § 1226(a) is not the applicable provision in his case, and § 1225(b) does not require a warrant.

### 3.    Mr. Rashid is Entitled to a Parole Determination

Although Mr. Rashid has no statutory right to a bond hearing, 8 C.F.R. § 241.11 entitles him to consideration for parole.  That regulation provides, in relevant part:

> The stowaway shall be detained in the custody of the Service pending the credible fear determination and any review thereof.  Parole of such [noncitizen], in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. A stowaway who has established a credible fear of persecution or torture in accordance with § 208.30 of this chapter may be detained or paroled pursuant to § 212.5 of this chapter during any consideration of the asylum application.  In determining whether to detain or parole the [noncitizen], the Service shall consider the likelihood that the [noncitizen] will abscond or pose a security risk.

*Id.* § 241.11(d)(1).

13

Section 241.11(d)(1) clearly delineates between the parole power before and after the credible fear interview. Before the credible fear interview, the default is detention, and a noncitizen can only receive parole for medical or law enforcement purposes. After a positive credible fear interview, the Department of Homeland Security has the authority to either detain the noncitizen or grant parole. Furthermore, the phrase "[i]n determining whether to detain or parole the [noncitizen]" suggests that DHS must actively choose between detention and parole after the credible fear interview; there is no longer a default of detention, and the detainee need not affirmatively apply for parole. Further, DHS "*shall* consider the likelihood that the [noncitizen] will abscond or pose a security risk" in making that determination.

Together, this language requires DHS to consider a stowaway for parole after a positive credible fear interview and further requires that DHS consider the traditional bond factors in making that determination. Because no one at DHS has considered Mr. Rashid for parole (Doc. 5-1 ¶ 21), he is entitled to a parole determination at this juncture.

### C.    Fifth Amendment

In addition to arguing that he has a statutory right to a bond hearing, Mr. Rashid argues that his prolonged detention violates the Due Process Clause of the Fifth Amendment. Specifically, he contends that his detention "bears no reasonable relation to any legitimate government purpose" because he poses neither a flight risk nor a danger to the community. (Doc. 1 ¶ 32, 33–34 (emphasis omitted).) He requests his immediate release or, in the alternative, a bond hearing before an immigration judge that takes into account only flight risk and dangerousness to the community. (*Id.* at 10.) The Government responds that Mr. Rashid's detention was constitutional at the outset, that it continues to be constitutional because it is

14

statutorily mandated, and, in the alternative, that the detention has not lasted so long as to offend the Constitution. (Doc. 9 at 5–6.)

Although the court has already determined that Mr. Rashid is entitled to a parole determination, the court will consider this constitutional argument and whether the Due Process Clause entitles Mr. Rashid to something more.

### 1. Unreasonably Prolonged Detention Under § 1225(b) Violates Due Process

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). That right to liberty extends to noncitizens. *Id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."). And it includes the right to be free from arbitrary civil immigration detention. *Id.* at 721 (stating that "both removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious") (Kennedy, J., dissenting).

This court recognizes that "detention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). Further, the court has already determined that § 1225(b)(1)(B)(ii) mandates Mr. Rashid's detention until the conclusion of his asylum proceedings. At the same time, the Supreme Court has made clear that detention incident to removal proceedings has only two legitimate regulatory goals: "ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (when determining whether to release a noncitizen from detention, an Immigration Judge considers whether the individual "is a

threat to national security, a danger to the community at large, likely to abscond, or otherwise a

poor bail risk"). And civil detention "can never be punitive, either by design or effect."

*Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025) (citing *Zadvydas*, 533 U.S. at 690,

*Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893), and *Ozturk v. Trump*, 779 F. Supp. 3d

462, 493 (D. Vt. 2025)); *see also Wong Wing v. United States*, 163 U.S. 228 (1896).

In *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), the Second Circuit had the opportunity

to consider the constitutionality of prolonged detention under a different mandatory detention

statute, 8 U.S.C. § 1226(c). That statute calls for the mandatory detention of noncitizens who

have been convicted of or arrested for certain crimes pending the final resolution of their

removal proceedings. *Jennings*, 583 U.S. at 303 (holding that "§ 1226(c) makes clear that

detention of [noncitizens] within its scope *must* continue 'pending a decision on whether the

[noncitizen] is to be removed from the United States" (quoting § 1226(c))). Though *Black*

concerned a different mandatory detention provision, its reasoning is instructive here.

The Second Circuit decided *Black* in the aftermath of two Supreme Court decisions,

*Demore* and *Jennings*. In *Demore*, "[t]he Supreme Court . . . held that detention under

section 1226(c) without an *initial* bond determination does not, on its face, violate the detainee's

due process rights where detention is 'for the limited period of . . . removal proceedings.'"

*Black*, 103 F.4th at 141 (second alteration in original) (quoting *Demore*, 538 U.S. at 531). In

*Jennings*, the Court held that, as a matter of statutory interpretation, the text of § 1226(c) does

not require a bond hearing after some set amount of time and mandates detention through the end

of removal proceedings—the same holding it reached with respect to § 1225(b). 583 U.S. at 303.

"Read together, then, *Demore* and *Jennings* instruct that (1) due process does not require an

*initial* bond determination for those detained under section 1226(c), and (2) section 1226's text

cannot be construed to require a bond hearing after any particular fixed period of detention." *Black*, 103 F.4th at 142. "Critically, however, *Demore* and *Jennings* le[ft] open the question whether prolonged detention under section 1226(c) without a bond here will *at some point* violate an individual detainee's due process rights" and did not address "what procedures due process may require." *Black*, 103 F.4th at 142.

In *Black*, the Second Circuit answered those questions. First, the court concluded "that due process bars the Executive from detaining [noncitizens] for an unreasonably prolonged period under section 1226(c) without a bond hearing." *Id.* at 143. In reaching that conclusion, the Second Circuit drew on language from *Zadvydas* and *Demore* regarding the length of immigration detention. First, the court looked to *Zadvydas*, in which the Supreme Court considered the constitutionality of prolonged immigration detention under 8 U.S.C. § 1231(a)(6). 533 U.S. at 682, 684–85. The Court ultimately avoided the constitutional question by reading § 1231 to require a bond hearing after six months, but its discussion raised serious questions about the constitutionality of a statute that allowed for indefinite civil detention without the opportunity for a bond hearing.

The Second Circuit then considered *Demore*, "where the Court upheld the facial constitutionality of detention under section 1226(c) without a bond hearing" but "did so while emphasizing the apparent brevity of detentions pending removal." *Black*, 103 F.4th at 143–44. As the *Black* court discussed, the Court in *Demore* distinguished *Zadvydas* on two grounds. First, in *Zadvydas*, the petitioners were being detained for their removal, yet removal was "'no longer practically attainable,' depriving detention of 'its purported immigration purpose' of facilitating removal." *Id.* at 144 (quoting *Demore*, 538 U.S. at 527). "Second, the [*Demore*] Court pointed out that 'the period of detention at issue in *Zadvydas* was "indefinite" and

"potentially permanent," while 'the detention [in *Demore*] is of a much shorter duration." *Id.*
(quoting *Demore*, 538 U.S. at 528). The Court then cited to data provided by the government
suggesting that, in 85% of cases, removal proceedings for § 1226(c) detainees were completed in
an average of 47 days and a median of 30 days and that, in the remaining 15% of cases, the
noncitizen appealed the decision, and the appeal took an average of four months. *Demore*, 538
at 528. "This Court's emphasis on the 'limited' period of detention strongly suggests a view
that, while it found detention without an initial bond determination to be facially constitutional,
'indefinite' and 'potentially permanent' detention without a bond hearing would violate due
process." *Black*, 103 F.4th at 144 (quoting *Demore*, 538 U.S. at 529–31).

In light of these Supreme Court cases, the Second Circuit held that due process "does not
permit the Executive to detain a noncitizen for an unreasonably prolonged period under
section 1226(c) without a bond hearing; at some point, additional procedural protections—like a
bond hearing—become necessary." 103 F.4th at 145.

"Most judges who have squarely faced the question have applied the same logic to
§ 1225(b), holding that arriving [noncitizens], like criminal [noncitizens], cannot be detained for
an unreasonably prolonged period of time without a bond hearing." *Bermudez Paiz*, 2018 WL
6928794, at *10 (collecting cases). As with § 1226(c), mandatory detention without an initial
bond hearing may not pose a problem at first; expedited removal of arriving noncitizens and the
summary removal of stowaways generally occur swiftly, and mandatory detention without a
bond hearing may serve the legitimate function of preventing flight during that brief phase. Even
for noncitizens who establish a credible fear of persecution, it may take just a few months for the
immigration court to reach a final decision on the asylum application. In this case, for instance,
Mr. Rashid received a grant of asylum approximately four months after he arrived in the United

States. (Doc. 5-1 ¶¶ 6, 11.) In the case of an appeal, however, detention may stretch on indefinitely. The individual's liberty interest increases over time, and the risk of an erroneous deprivation of liberty may become more egregious, just as it does for noncitizens detained under § 1226(c).

The court rejects the Government's suggestion that prolonged detention cannot violate due process unless it is "indefinite" or "potentially permanent." *See Zadvydas*, 533 U.S. at 696 ("[W]e believe that a[] [noncitizen's] liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, the Constitution permits detention that is indefinite and potentially permanent." (internal citation omitted)). In *Black*, the Second Circuit took aim at detention that was "unreasonably prolonged," not detention that was indefinite. Furthermore, the petitioners in *Black* had a "fixed" end to their mandatory detention—the end of their removal proceedings—just as there is a fixed end to Mr. Rashid's mandatory detention. The detention was not indefinite, but the Second Circuit nevertheless found it could violate the Constitution.

Finally, the court must address how the constitutional rights of someone like Mr. Rashid differ from noncitizens detained under § 1226(c), given the so-called "entry fiction." As explained in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), constitutional rights apply with greater force to noncitizens physically within the U.S. than to those outside of the U.S. In *Mezei*, the petitioner, who faced indefinite detention at Ellis Island, was detained as an excludable noncitizen—the equivalent of an "arriving" noncitizen. Though the government chose to detain the petitioner on U.S. soil, the Supreme Court reaffirmed its longstanding position that "such temporary arrangements [do] not affect[] a[] [noncitizen]'s status; he is treated as if stopped at the border." *Id.* at 215. Hence the "entry fiction": the petitioner had

physically "entered" the United States—he was detained on Ellis Island—but, for constitutional purposes, he was treated as though he were physically outside the U.S. The Court then held that the indefinite detention of a noncitizen "permanently excluded from the United States on [national] security grounds but stranded . . . on Ellis Island because other countries will not take him back" did not violate the Due Process Clause. *Id.* at 207.

The context in which *Mezei* was decided matters. The case, decided at the height of the Cold War, "explicitly tailored its holding to the national security context," *Lett*, 346 F. Supp. 3d at 386, noting that "[a]n exclusion proceeding grounded on danger to the national security . . . presents different considerations" than a typical deportation proceeding and that "to admit a[] [noncitizen] barred from entry on security grounds nullifies the very purpose of the exclusion proceedings." *Mezei*, 345 U.S. at 215–16. Furthermore, before the petitioner even filed his habeas petition, "the Attorney General had already found, on an individualized basis, . . . that Mezei was a security risk and consequently not entitled to either admission or bail." *Jennings*, 583 U.S. at 340 (Breyer, J., dissenting). The petitioner in *Mezei* had also been permanently excluded from the United States and had no possible basis for gaining status in the country. "Thus, *Mezei* may compel the conclusion that arriving [noncitizens] already excluded on national security grounds are not entitled to a bond hearing prior to their arranged deportation. However, *Mezei* does not compel the categorical conclusion that all arriving [noncitizens] may be subject to prolonged confinement without a bond hearing." *Lett*, 346 F. Supp. 3d at 386.

*Mezei* also stands in contrast to more recent Supreme Court cases, which have emphasized that "all persons within the territory of the United States are entitled to the protection" of the Constitution." *Zadvydas*, 533 U.S. at 694 (quoting *Wong Wing*, 163 U.S. at 238); *see also Mathews v. Diaz*, 426 U.S. 67, 78 (1976) ("[A]ll persons, [noncitizens] and

citizens alike, are protected by the Due Process Clause . . . ."). In short, "[a]rriving [noncitizens] subject to the 'entry fiction' may possess fewer rights than other categories of [noncitizens], but all persons physically on U.S. soil, regardless of their immigration status, are entitled to *some* due process protection, including protection from prolonged, indefinite, and otherwise unreviewable detention pursuant to § 1225(b)." *Bermudez Paiz*, 2018 WL 6928794, at *12 (internal quotation marks and citations omitted). That is particularly true for noncitizens like Mr. Rashid, who have established a credible fear of persecution and the potential right to remain in and become citizens of this country.

### 2.    Constitutionality of Prolonged Detention Should be Evaluated Under *Mathews v. Eldridge*

The next question is how to evaluate whether detention has become unreasonably prolonged. In *Black*, the Second Circuit held that there is no fixed point at which a bond hearing becomes constitutionally necessary. 103 F.4th at 150. Instead, courts should assess due process challenges to prolonged detention under § 1226(c) on a case-by-case basis under *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 147. The Second Circuit has similarly applied *Mathews* to claims of prolonged detention under § 1226(a). *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020). In doing so, it has emphasized the flexibility of the *Mathews* test and its ability to take account of individual circumstances. It is therefore highly likely that the Second Circuit will apply the *Mathews* framework when it has the opportunity to consider prolonged detention under 1225(b). The court will apply *Mathews* here.

In *Mathews*, the Supreme Court identified three factors that bear on the constitutional need for procedural protections: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the

21

Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. As the Second Circuit explained in *Black*, this test is a flexible one that allows courts to consider due process requirements on a case-by-case basis. *Black*, 103 F.4th at 148. The flexibility of the test also allows it to "account for those concerns that the S.D.N.Y. and the Third Circuit have considered when deciding when detention has become unreasonably prolonged, and the detainee entitled to a bond hearing." *Id.* Those factors include (1) the length of time the petitioner has been detained; (2) whether the government or the petitioner is primarily responsible for the delay; (3) whether the petitioner has a colorable defense to removal; (4) whether the conditions under which the petitioner is confined are meaningfully different from the conditions experienced by those serving a criminal sentence; and (5) the likely duration of continued detention. *Id.* at 146 (citing *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018).

### 3.    Mr. Rashid's Detention is Unreasonably Prolonged

#### a.    Private Interests

As in *Black* and *Velasco Lopez*, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). Further, as in *Velasco Lopez*, "[t]he deprivation that [Mr. Rashid has] experienced [is] not the result of a criminal adjudication." *Id.* Yet, he is detained in Northwest State Correctional Facility in Saint Albans, Vermont, a prison. (Doc. 1 ¶ 13.) He has been detained for 15 months. During those months in detention, Mr. Rashid has been unable to reunite with his family in Ohio. He cannot

work or begin establishing a life in a country where he has been granted asylum by an immigration judge.

"The longer the duration of the incarceration, the greater the deprivation." *Velasco Lopez*, 978 F.3d at 852. Thus, while mandatory detention without a bond hearing may be constitutional at the outset, the Second Circuit has held that, as the period of confinement increases, "so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention." *Id.* at 853. As noted above, there is no set point at which detention without a bond hearing becomes unconstitutional. But courts in this circuit have generally found that detention lasting for more than a year—and in many cases less than a year—may require a bond hearing at which the Government bears the burden of proof. *See Black*, 103 F.4th 133 (bond hearing was warranted where petitioner had been detained for 10 months); *Cabral v. Decker*, 331 F. Supp. 3d 255 (S.D.N.Y. 2018) (granting bond hearing where petitioner had been detained for over seven months); *Bermudez Paiz v. Decker*, No. 18-CV-4759, 2018 WL 6928794, at *7 (S.D.N.Y. Dec. 27, 2018) (stating that 16 months was an "extraordinary length of time" to be "continuously incarcerated" and granting petitioner a "prompt bond hearing"); *Velasco Lopez*, 978 F.3d 842 (bond proceeding was warranted where petitioner had been detained for 15 months); *Dukuray v. Decker*, No. 18 CV 2898, 2018 WL 5292130 (S.D.N.Y. Oct. 25, 2018) (ordering bond hearing where petitioner had been detained for 10 months); *J.M.P. v. Arteta*, 25 Civ. 4987, 2025 WL 2614688 (S.D.N.Y. Sept. 10, 2025) (slip copy) (ordering bond hearing where petitioner had been detained for more than seven months).

At oral argument, the Government contended that the court should discount the time Mr. Rashid spent detained before he was granted asylum or, at the very least, discount the first two months of Mr. Rashid's detention because he had not yet filed his asylum application. The

court knows of no other case where a court discounted part of a petitioner's detention, and it sees no reason to do so here. Mr. Rashid's detention has had very real impacts on him from the beginning. The circumstances and the strength of its justification may have changed as his case has progressed, but that does not change the fact that he was, as a matter of fact, detained beginning in July 2024.

Even if the court discounted some portion of Mr. Rashid's detention, the court must also consider the probable length of his continued detention. "Absent release on bond, detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the Government appeals." *Velasco Lopez*, 978 F.3d at 852. Here, Mr. Rashid prevailed in his asylum proceedings before the immigration court, and the Government appealed the case to the BIA. Although the parties completed their briefing in July 2025 (Doc. 5-1 ¶ 16), the BIA can take months—or longer—to issue a decision on appeal. *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1119 (W.D. Wash. 2019) (appeal to BIA could take up to two years or longer, weighing in favor of petitioner's release from detention); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 212 (3d Cir. 2020) (appeal to BIA "could take months"). Further, whether the BIA sustains or reverse the immigration judge's grant of asylum, the losing party may seek an appeal with the First Circuit. These considerations weigh in favor of additional process to justify the Government's continued detention of Mr. Rashid.

### b.    Risk of Erroneous Deprivation and Benefit of Additional Process

As discussed above, detention in the immigration context "has two regulatory goals: ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Matter of Guerra*,

24 I&N Dec. 37, 40 (BIA 2006) (when determining whether to release a noncitizen from detention, an Immigration Judge considers whether the individual "is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk"). Thus, if Mr. Rashid is being detained despite the fact that he is neither a flight risk nor a danger to the community, the Government is erroneously depriving him of his freedom.

Because the central issue in this case is whether there is a legitimate reason for Mr. Rashid's detention, the fact that his "asylum application has proceeded apace" (Doc. 9 at 7), does not mean that there is no due process concern or possibility of an erroneous deprivation of liberty. The court respectfully disagrees with the contrary argument advanced by the district court in *Ramos Funes*, 2020 WL 1956346 (W.D.N.Y. Apr. 23, 2020). In that case, the court reasoned that, "[p]rovided that removal proceedings are progressing toward completion, even if slowly, continued mandatory detention without a bond hearing does not violate due process unless the detention, beyond the mere fact of the delay, has become unreasonable or unjustified on the Government's part." *Id.* at *18. The problem with the formulation in *Ramos Funes* is that, without a bond hearing, there is no way to know if the detention has become unreasonable or unjustified. The reason a bond hearing may eventually become necessary is because, as the length of detention increases, so does the gravity of the erroneous deprivation, if indeed it is erroneous. Hence the Second Circuit's holding that, as detention drags on, the procedural protections for ensuring its continued legitimacy must become more robust. *Velasco Lopez*, 978 F.3d at 852. *Ramos Funes* is an outlier, and the court declines to follow it here.

Turning to the risk of erroneous deprivation in this case, the current procedures afforded to someone in Mr. Rashid's position are minimal. Stowaways detained under § 1225(b) have no statutory right to an individualized bond hearing to test the need for detention. The only

25

procedural protection is DHS's discretion to grant parole to a detainee who has demonstrated a credible fear of persecution. 8 C.F.R. § 241.11. "Other courts in this circuit to consider the constitutionality of indefinite detention under section 1225(b) have . . . discussed the reasons why parole is an inadequate protection," *Ahmed v. Decker*, No. 17-cv-0478, 2017 WL 6049387, at *7 (S.D.N.Y. Dec. 4, 2017): The regulation allowing for parole does not provide Mr. Rashid with an opportunity to present evidence, and it does not specify a standard of proof. It merely requires that DHS consider, to some extent, flight risk and dangerousness to the community. Further, "the parole decision is not made by a neutral judicial arbiter, but rather by an executive officer of the Department of Homeland Security," and the determination is a discretionary one that is often "unreviewable by an immigration judge or federal court." *Id.* (cleaned up).

"Even in the context of Velasco Lopez's section 1226(a) detention, where he received two bond hearings at which he bore the burden of proof, [the Second Circuit] concluded that 'the procedures underpinning [his] lengthy incarceration markedly increased the risk of error.'" *Black*, 103 F.4th at 152 (alteration in original) (quoting *Velasco Lopez*, 978 F.3d at 852). Here, Mr. Rashid is entitled to even fewer procedural protections, "and the risk of erroneous deprivation is correspondingly greater." *Id.*

The risk of erroneous deprivation is also heightened for Mr. Rashid in particular. He has already won his asylum case before the immigration court, so in the absence of a legal error by the immigration judge, it is likely he will ultimately be allowed to remain in the United States, build a life here, and eventually become eligible for citizenship. As part of the asylum application process, he has already undergone and passed an initial round of vetting, including criminal record checks and screening for possible national security risks. *See* 8 C.F.R. § 1003.47. Even when a petitioner simply has an asylum application pending, courts in this

circuit have weighed that factor in favor of the petitioner—and have done so without inquiring into the underlying strength of the application—because of the "possibility that the Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the Petitioner pending a final determination as to whether he is removable." *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018).

Though this court will not undertake a full evaluation of Mr. Rashid's flight risk or dangerousness, it is also worth noting that nothing in the record suggests that he would be a poor bail risk or that a hearing would be futile. He has family in Ohio with whom he wishes to reunite, some of whom are U.S. citizens. He has been granted asylum and has a talented team of lawyers representing him in his appeal, so he has every incentive to continue attending his immigration proceedings. He has no criminal record, and any future criminal activity would jeopardize his asylum application.

In light of these considerations, the court must assess the possible benefit of additional process. In this case, Mr. Rashid has not yet received *any* kind of process to test the legitimacy of his detention.[2] At the same time, the court has found today that Mr. Rashid is entitled to a parole determination that takes into account risk of flight and dangerousness to the community. Still, Mr. Rashid would benefit from additional process beyond a parole determination. Notably, the regulation that entitles Mr. Rashid to a parole determination does not provide him with an opportunity to present evidence, and it does not specify a standard of proof. 8 C.F.R. § 241.11. It merely requires that DHS consider, to some extent, flight risk and dangerousness to the

---

[2] Although Mr. Rashid received a bond hearing before the Chelmsford Immigration Court on September 25, 2025, the immigration judge determined that Mr. Rashid was subject to mandatory detention and therefore did not consider whether he was a flight risk or a danger to the community.

community. An evidentiary hearing before an immigration judge at which the Government bears the burden of proof would undoubtedly provide greater protection against an erroneous deprivation of Mr. Rashid's liberty.

This factor weighs heavily in Mr. Rashid's favor.

### c.    The Government's Interest

The last *Mathews* factor considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. As already noted, the Government has a legitimate interest in ensuring that noncitizens appear at their immigration proceedings and in preventing noncitizens from perpetrating harm in their communities during the pendency of their removal proceedings.

As in *Black*, "the additional procedural safeguards [the court] would allow here under *Mathews* do nothing to undercut those interests." 103 F.4th at 153. At a bond hearing before an immigration judge, that judge would assess Mr. Rashid's flight risk and dangerousness on an individualized basis, just as immigration judges routinely do in other cases. "And while the government's legitimate interests justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* at 154 (internal citation omitted). In fact, "[t]o require that the Government justify continued detention 'promotes the Government's interest—one [the court] believe[s] to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id.* (quoting *Velasco Lopez*, 978 F.3d at 854).

Finally, as the Second Circuit noted in both *Black* and *Velasco Lopez*, any administrative burden imposed by this additional process would likely be outweighed by the reduced costs of

unnecessarily detaining noncitizens who are neither a flight risk nor dangerous to the community. "[T]he Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day. Other estimates have placed the cost as high as $134 per day." *Black*, 103 F.4th at 154. The administrative burden would therefore be negligible.

For these reasons, the final factor also weighs in Mr. Rashid's favor.

### 4.    Remedy

It remains for the court to decide what process Mr. Rashid is due. Mr. Rashid requests that the court grant his immediate release. His interest in his liberty, however, must be weighed against the government's legitimate interests in detaining noncitizens who are a flight risk or who are a danger to the community.

As discussed above, Mr. Rashid already has a regulatory right to a parole determination, but that process provides significantly fewer protections than a bond hearing before an immigration judge. In determining whether due process entitles Mr. Rashid to something more than a parole decision, the court once again looks to *Black*. There, the Second Circuit upheld the district court's order that the government justify the petitioner's continued detention by clear and convincing evidence at a bond hearing before an immigration judge:

> Where the government seeks to continue depriving a person of their liberty—especially when a district court has already found that deprivation to be unconstitutionally prolonged—we must require the government to bear the burden of proving the need for continued detention. Otherwise, 'the risk of an erroneous deprivation' of a detainee's liberty interest would remain unacceptably high.

*Black*, 103 F.4th at 155 (quoting *Mathews*, 424 U.S. at 335). The court reasoned that it was necessary to place the burden on the government for three reasons: First, most noncitizens are unrepresented and therefore at a disadvantage in their bond proceedings. *Id.* at 156. Second, detained noncitizens have a particularly hard time communicating with counsel even when they

*are* represented, "making preparation of their cases more difficult while in detention—with or without a lawyer." *Id.* Finally, "[r]equiring that detainees . . . prove that they are *not* a danger and *not* a flight risk—after the government has enjoyed a presumption that detention is necessary—presents too great a risk of an erroneous deprivation of liberty after a detention that has already been unreasonably prolonged." *Id.* Finally, the Second Circuit held that the government had to prove dangerousness or flight risk by clear and convincing evidence, the standard that "the Supreme Court has consistently used . . . for continued detention." *Id.* at 157.

This reasoning applies with equal force to noncitizens detained under § 1225(b), including Mr. Rashid. Although Mr. Rashid is represented, he, like other detained noncitizens, has faced barriers to communication with his attorneys due to his imprisonment. He would also face the same challenges proving in the negative that he is neither a flight risk nor a danger to the community. Where Mr. Rashid has already faced over a year of detention, it should be the Government that bears the burden of proving flight risk or dangerousness. Further, as in *Black*, the court sees no reason to deviate from the clear and convincing evidentiary standard used in cases of prolonged detention.

Lastly, assuming that the immigration judge does not find that Mr. Rashid is a danger to his community, "an immigration bond hearing that fails to consider ability to pay or alternative conditions of release is constitutionally inadequate." *Lett*, 346 F. Supp. 3d at 389. Following the *Mathews* analysis, the "'risk of an erroneous deprivation' of the noncitizen's liberty if alternatives to detention and ability to pay are not considered at the ordered bond hearing is the focus of [the court's] concern." *Black*, 103 F.4th at 158. The immigration judge will retain discretion to determine the appropriate conditions of bond, but she must consider these two particular factors in reaching her conclusion.

The purpose of this bond hearing would be undermined if the immigration judge were permitted to consider the fact that Mr. Rashid is subject to mandatory detention and end her analysis there. In conducting the bond hearing, the immigration judge must consider only whether he is a flight risk or a danger to the community.

### D.    Fourth Amendment

Mr. Rashid argues that his prolonged detention also violates his Fourth Amendment right to be free from unreasonable seizures. He contends that "[e]ven a detention that begins lawfully can become an unreasonable seizure if the reason for it ceases to exist or [it] is unreasonably prolonged." (Doc. 8 at 7.) In this case, he argues that there is no longer a reason for his detention because he is neither a flight risk nor a danger to the community, yet "Congress intended to delegate authority to [DHS] to detain noncitizens during removal proceedings only insofar as is necessary to protect public safety and ensure the noncitizen's appearance for their removal proceedings." (*Id.*) The Government responds that Mr. Rashid's claim sounds in due process, not the Fourth Amendment. The Government further argues that, even if Mr. Rashid has stated a claim under the Fourth Amendment, habeas is not an appropriate remedy for an unreasonable seizure.

The Second Circuit has long analyzed claims of prolonged detention under the Due Process Clause, not the Fourth Amendment. *See Black*, 103 F.4th 133; *Velasco Lopez*, 978 F.3d 842; *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015); *Michalski v. Decker*, 279 F. Supp. 3d 487, 496, 496 n. 6 (S.D.N.Y. 2018) (although Fourth Amendment might apply to "initial arrest and detention pending removal proceedings," "[c]hallenges to the length of civil immigration detention—including under 8 U.S.C. §§ 1225(b), 1226(a), and 1226(c)—have typically been on

due process grounds"). Mr. Rashid has not cited, and the court has not found, any case applying the Fourth Amendment to a claim of prolonged immigration detention.

Mr. Rashid's right to be free from unreasonably prolonged detention cannot come from both the Due Process Clause and the Fourth Amendment. As the Supreme Court has explained, many rights can find a home under the "generalized notion of 'substantive due process,'" but, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment . . . must be the guide for analyzing the[] claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). If the Fourth Amendment provided the explicit textual source for Mr. Rashid's right against prolonged immigration detention, it would supplant, not supplement, his Due Process claim.

Given that the Second Circuit has consistently analyzed similar claims under the Fifth Amendment rather than the Fourth Amendment, the court agrees with the Government and DENIES Mr. Rashid's Habeas Petition insofar as it seeks relief under the Fourth Amendment.

## Conclusion

For the foregoing reasons, the Motion for Leave to Amend the Habeas Petition and to File Supplemental Briefing (Doc. 10) is DENIED.

The Habeas Petition (Doc. 1) is GRANTED IN PART and DENIED IN PART, as set forth in this order. Respondents are ordered to provide Mr. Rashid with a bond hearing consistent with this court's opinion within 14 days. If the immigration judge denies bond, Respondents are ordered to make a determination as to whether Mr. Rashid should receive parole

within 10 days of the bond hearing. Mr. Rashid shall not be moved out of the state of Vermont prior to his bond hearing or, if applicable, prior to receiving his parole decision.

Dated at Burlington, in the District of Vermont, this 27th day of October, 2025.

Geoffrey W. Crawford, Judge
United States District Court